**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **Warren A. Bryant,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **C.A. No._____** |
| **v.** | § | |
| | § | |
| **Phillips 66 Company,** | § | |
| | § | |
| **Defendant.** | § | **(JURY TRIAL DEMANDED)** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW Plaintiff, Warren A. Bryant, filing his Original Complaint complaining of Defendant, Phillips 66 Company, and in support thereof would show as follows:

**I.
JURISDICTION, PARTIES AND VENUE**

1.      This Court has jurisdiction over the causes of action alleged by Plaintiff pursuant to (i) 42 U.S.C. §1981, (ii) Title VII of the Civil Rights Act of 1964, as amended, and (iii) both statutes' related anti-retaliation regulations.

2.      Warren A. Bryant resides in Missouri City, Fort Bend County, Texas.  Plaintiff is an African-American and is protected by 42 U.S.C. §1981 and Title VII.  Plaintiff was at all relevant times an employee within the meaning of the applicable statutes.

3.      Phillips 66 Company operates in Texas.  Defendant was at all times Plaintiff's employer within the meaning of the aforementioned applicable statutes.

-1-

4.      Phillips 66 Company engaged in an industry affecting commerce and employed more than fifteen (15) regular employees.

5.      The employment practices alleged to be unlawful herein were committed within the Southern District of Texas, Houston Division.  Venue is appropriate in this Court.

VICARIOUS LIABILITY--RESPONDEAT SUPERIOR

6.      Whenever in this complaint it is alleged that the Defendant Phillips 66 Company did any act or thing, it is meant that the Defendant Phillip 66's supervisors, agents, servants, employees or representatives did such act and/or that at that time such act was done, it was done with the full authorization or ratification of the Defendant Phillip 66 or was done in the normal and routine course and scope of employment of Defendant Phillip 66's supervisors, agents, servants, employees, or representatives.

7.      The acts of management were performed while in the employment of Defendant Phillip 66, to further Defendant Phillip 66's business, to accomplish the objective for which said managers were hired, and within the course and scope of that employment or within the authority delegated to said employees.

II.
EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      Plaintiff, Warren A. Bryant, filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission on or about April 7, 2015.  In that Charge, No. 460-2015-02209, and any amendments and/or attachments thereto, Plaintiff Bryant asserted that Defendant discriminated against him because of his race and retaliated against him for complaining about such discrimination.

9.      Therefore, Plaintiff was forced to file this suit in order to protect his employment rights.  Plaintiff has exhausted his administrative remedies and files this suit within the statutory limitations period.

### III.
### FACTUAL BACKGROUND

10.      Plaintiff (African-American) began his employment at Phillips 66 Company in or about October of 2012.  He worked as an operator in the Stock department.

11.      Almost from the start, Plaintiff felt that he was not welcomed by many of the other operators including Todd Jones (Caucasian). It was clear to Plaintiff that Mr. Jones was well-regarded at Phillips 66 Company and that he had a lot of influence with management.  In fact, Mr. Jones was tasked to train Plaintiff when he and Plaintiff worked at the Truck Rack. However, Mr. Jones refused to train Plaintiff fully.  Too, he refused to train him properly.  And, when he "trained" Plaintiff, Mr. Jones was verbally abusive and insulting.  Mr. Jones would openly comment, "Can you fucking read?" and the like. Though it was extremely embarrassing, Plaintiff remained professional and learned what he could from Mr. Jones and learned the rest elsewhere.

12.      Plaintiff personally observed Mr. Jones interact with Caucasian employees; Mr. Jones was very cordial to them.  However, Plaintiff noticed that when it came to African-American employees, Mr. Jones tended to attack their intelligence.  For example, there was an African-American employee named Belinda (whose last name Plaintiff cannot recall) who was denigrated too.  Mr. Jones would say things about her like, "If you want to hear the sound of stupid, there it goes."  Conversely, there was a Caucasian machinist who made a grave error

resulting in his termination.  Mr. Jones was extremely sympathetic.  He said, "That's going to be a heck of a loss.  It will be hard to replace him."

13.    Mr. Jones did not stop there.  After completing Plaintiff's "training," he would deliberately stifle Plaintiff's work performance.  For example, Mr. Jones and others (e.g., Randall Laughlin, Tommy Cantrell, and Ryan Hicki – all Caucasian) would deny Plaintiff access to company trucks to escort drivers onto the rack for important matters like delivering ammonia to the refinery.  It was Plaintiff's job to escort said drivers onto the premises.  To get compliance, Plaintiff had to go to the Lead Operator.

14.    There were so many incidences of poor treatment of Plaintiff by Mr. Jones but he initially chose not to report them because he feared a backlash especially after seeing how close nit the group was to Mr. Jones.  Instead, Plaintiff went out of his way to foster positive working relationships.  He would buy and bring in lunches for his peers.  This seemed to placate Mr. Jones only for a brief period and then he returned to his mean-spirited treatment towards Plaintiff.

15.    Plaintiff was constantly asking for cross training at the refinery tank farm because that was the way to get his second certification and advance.  He was always at the mercy of Mr. Jones and others to train him.  He was either given excuses like "Worry about the truck rack." *Or,* he was told that training him was "not my job!" by Mr. Jones. *Or,* Plaintiff could tell that most seemed unwilling to share their knowledge. Most of Plaintiff's peers exhibited signs that they were disgusted by his questions or flat out refused to answer him. He was not easily deterred.  Plaintiff would insinuate himself into the good graces of the few employees who would show him a thing or two. The rest Plaintiff learned from any and every source he could. He felt

alone.  He would literally walk the lines in the rain, heat and mosquito-infested atmosphere to become familiar with the aspects of his job. It paid off.  Plaintiff passed all exams and was certified on or about July 3, 2014.

16.     Plaintiff was assigned to work overtime hours on or about August 4-6, 2014. Plaintiff was assigned to partner with Mr. Jones.  On August 4 and 5, Mr. Jones berated Plaintiff from the beginning of the shift until the end.  He did so openly.  Plaintiff tried to diffuse the situation by talking to Mr. Jones calmly but Mr. Jones replied with profanity and yelling.  On August 5, Mr. Jones commented essentially that "You can train any monkey to come in here and turn a valve but you have to be able to read that screen." Plaintiff managed to work through August 4 and 5 – two of the most intense, humiliating and unproductive days he had ever experienced at Phillips 66 Company. Plaintiff simply could not take working another day under those conditions.   Plaintiff asked another employee, Aaron Flores, to work for him on August 6.

17.     After quietly enduring years of open disrespect, Plaintiff had had enough.  On or about August 6, Plaintiff reported Mr. Jones to Team Lead Tim Burrell.  Plaintiff gave Mr. Burrell a written statement.  Plaintiff told him that he feared retribution so he asked Mr. Burrell if he would handle this matter personally.  Mr. Burrell agreed.

18.     When Plaintiff reported to work on or about August 8, Mr. Flores asked him if he reported Todd Jones to Human Resources.  Plaintiff was floored.  More than that, Plaintiff was fearful.  He wondered how many people knew of his complaint.  Plaintiff wondered how he would be treated now that he made such a complaint.

19.     On or about August 21, Plaintiff worked with Jacob Aparicio. A tank overfilled. The next day, an investigation ensued by a panel of investigators.  Just before Plaintiff was

interviewed, Mr. Burrell told him that he had spoken to Mr. Jones and that he (Mr. Burrell) truly did not believe that Mr. Jones meant the statement as Plaintiff took it.  Mr. Burrell added that Mr. Jones "was only trying to help."  At the conclusion of the investigation, Mr. Aparicio and Plaintiff were both suspended without pay for approximately 14 days.  Importantly, Plaintiff was not in the control room when the tank over-fill occurred.

20.	In September of 2014, Plaintiff was called to work for a meeting with Labor/Employee Relations M. Keith Cutter and R.W. "Bud" Barber.  Plaintiff reiterated what transpired between himself and Mr. Jones.  Plaintiff was told that it was not up to Mr. Burrell to leave human resources out the loop.  Plaintiff left that meeting and returned to his time off per the suspension.

21.	Later on and while out on suspension, Plaintiff received a phone call from Devin Lemon telling me that Mr. Jones was "pissed off" because he received several days off of work.  Mr. Lemon told Plaintiff that at least one other operator, Mark Bertch, was "pissed off" at him as well.

22.	When Plaintiff returned to work from suspension, he was told that he had to re-certify.  Jacob Aparicio had to re-certify as well. Plaintiff busied himself preparing for that.  But, he could feel the tension in the air.

23.	On Plaintiff's very first day back at work, Mr. Burrell told him that the operators were okay working with Jacob Aparicio but considered Plaintiff a "whistleblower."  He added that none of the operators wanted to work with Plaintiff.  Mr. Burrell then suggested that Plaintiff go to those guys and talk to them.  He said Plaintiff had "bridges to mend."  Mr. Burrell stated again that Mr. Jones did not mean the monkey statement in the way that Plaintiff took it.

24.     On Plaintiff's second day back, Rick Washington and Devin Lemon told him that the rumor mill said that Plaintiff was not talking to the other operators.  Plaintiff explained that he had so much to catch up on since being off of work.  They then added that if Plaintiff wanted to keep his job, he needed to open up to the guys.  They gave Plaintiff examples of how to do that including saying, "Man, I'm sorry!  I was wrong! I really need you to forgive me!"  They said the same things as Mr. Burrell that Plaintiff needed to mend bridges and that he was a whistle-blower.  It was said that Mr. Jones did not mean the monkey statement and that many thought Plaintiff complained about Mr. Jones *after* the tank over-fill. To be sure, Plaintiff complained about Mr. Jones before the tank over-fill.

25.     Plaintiff did not want any further trouble.  So, Plaintiff began talking to different operators trying to make peace.  Interestingly, the one question Plaintiff heard more than once was, "Why did you have to write a statement on Todd [Jones]?"

26.     Plaintiff believes he was intentionally given a difficult time during his re-certification process unlike Mr. Aparicio.  Even though Plaintiff certified again for the second time in six months, Mr. Barber insisted on a walk through.  Mr. Barber refused to pass Plaintiff.

27.     Plaintiff was told in November of 2014 that if he did not complete the walk through by the end of December 2014 he would basically be terminated.

28.     On or about December 17, 2014, Plaintiff met with Mr. Burrell and Mr. Cutter. They told Plaintiff that there were allegations made against him that he acted aggressively towards another employee, which is absolutely untrue.  They added that there were additional claims of other acts of aggression against Plaintiff as well.  Plaintiff denied then, and now, each and every instance.   Plaintiff told management that he believed he was being set-up for

termination because of his race-based complaint against Mr. Jones. Plaintiff informed them of new acts of discrimination and retaliation against him.

29.     In the end and in a letter dated December 31, 2014, Plaintiff was terminated.

30.     The effect of the practices complained of herein have been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his race and opposition to discrimination.

## IV.
## CAUSES OF ACTION

### A.     RACE DISCRIMINATION PURSUANT TO 42 U.S.C. §1981 And TITLE VII

31.     Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraphs above and incorporate the same herein as though fully set forth.

32.     Defendant, through its agents, supervisors, or employees violated Plaintiff's civil rights in violation of 42 U.S.C. §1981 and Title VII, by intentionally interfering with Plaintiff's work performance because of his race.

33.     This intentional interference consisted of discrimination of a continuous nature.

34.     Defendant, through its agents, supervisors, or employees discriminated against Plaintiff, which led to the loss and impairment in whole or part, of the wages, benefits, privileges, and terms and conditions of Plaintiff's employment.

35.     The above-described acts on Defendant's part caused Plaintiff's substantial injury and damage.

### B.     RETALIATION PURSUANT TO 42 U.S.C. §1981 And TITLE VII

36.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above and incorporate the same by reference as though fully set forth herein.

37.     After complaining to management of racially-motivated, Plaintiff was subsequently and repeatedly harangued, ignored and ultimately terminated.

38.     As herein alleged, Defendant illegally retaliated against Plaintiff because he opposed discrimination and complained of same.  Defendant had no legitimate business reasons for any of such acts.  Each act of retaliation is in violation of 42 U.S.C. §1981 and Title VII anti-retaliation provisions.

39.     As a direct and proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against them, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress.  Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

40.     The above-described acts on Defendant's part were undertaken in violation of 42 U.S.C. §1981 and Title VII and proximately caused Plaintiff's substantial injuries and damages.

## V.
## JURY DEMAND

41.  Plaintiff's request that this action be heard before a jury.

## VI.
## DAMAGES

42.  Defendant's conduct constitutes violations of statutory and/or common law.  Such unlawful conduct seriously affects Plaintiff in his occupation, trade and business.  Because of Defendant's unlawful conduct, Plaintiff has suffered, suffers, and will continue to suffer humiliation, mental anxiety and stress, and other damages.  Plaintiff has suffered direct injury as a proximate result of the unlawful discriminatory practices, policies, and procedures of Defendant.  Accordingly, Plaintiff seeks all general, special, incidental, and consequential damages in an

amount to be proved at trial including punitive damages.

43. Because of Defendant's unlawful and tortious conduct, it has been necessary for Plaintiff to retain the undersigned attorney to represent him in these causes of action Plaintiff has agreed to pay his attorney reasonable attorney's fees for the preparation and trial of these causes, and further for any appeal thereof should same become necessary.

44. Additionally, Plaintiff has incurred out-of-pocket expenses, which include litigation costs and other expenses to preserve their ability to earn a living. Accordingly, Plaintiff seeks all general, special, incidental, and consequential damages as shall be proven at trial.

45. Further, Plaintiff seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to Defendant. Plaintiff also seeks post-judgment interest at the maximum rate allowed by law in the event that Defendant do not promptly tender damages assessed against it and to avoid unjustly enriching Defendant.

## VII.
## PRAYER

WHEREFORE, premises considered, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff has judgment against Defendant for:

    a.    Permanent injunction enjoining Defendant, its agents, successors, employees, and those acting in consort with Defendant from engaging in any employment practice which discriminates on the basis of race and in retaliation.

    b.    All damages to which Plaintiff may be entitled pursuant to this Complaint, or any amendment(s) thereto, including but not limited to back pay, reinstatement or front

pay in lieu of reinstatement, loss of earnings in the past, loss of earning capacity in the future, loss of benefits in the past, loss of benefits in the future, statutory relief at law, and equity;

c. Compensatory damages for pain and mental suffering in the past and future;

d. Punitive damages in an amount above the minimum jurisdictional limit of the Court;

e. Reasonable attorney's fees, with conditional awards in the event of appeal;

f. Pre-judgment interest at the highest rate permitted by law;

g. Post-judgment interest from the judgment until paid at the highest rate permitted by law;

h. Costs of court and expert witness fees incurred by Plaintiff in the preparation and prosecution of this action; and

i. Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Complaint or by any amendment hereto.

Respectfully submitted,
Law Offices of Katrina Patrick

*/s/ Katrina Patrick*

_____

**Katrina Patrick**
Attorney-in-Charge
State Bar No. 00797218
Federal Bar No. 22038
2800 Post Oak Blvd #4100
Houston, Texas  77056
Telephone:  (713) 796-8218
Facsimile:  (832) 390-2499

**ATTORNEY FOR PLAINTIFF
WARREN BRYANT**